**FILED**
**Apr 25, 2023**
**07:00 AM(CT)**
**TENNESSEE COURT OF**
**WORKERS' COMPENSATION**
**CLAIMS**



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
### AT NASHVILLE

| | | |
|---|---|---|
| **Savitri Matthews,** | ) | **Docket No. 2021-06-1175** |
| **Employee,** | ) | |
| **v.** | ) | |
| **Family Dollar Stores of Tennessee,** | ) | |
| **LLC,** | ) | **State File No. 118458-2019** |
| **Employer,** | ) | |
| **And** | ) | |
| **Safety Nat'l Cas. Co.,** | ) | |
| **Carrier.** | ) | **Judge Kenneth M. Switzer** |

---

## COMPENSATION ORDER

---

Savitri Matthews has endured many hardships in her life. Ms. Matthews believes this case is about just one of them; Family Dollar Stores of Tennessee says it is about them all.

Ms. Matthews suffered post-traumatic stress disorder after an armed robbery at her former workplace, Family Dollar. The parties agree that the robbery, and harassment from the gunman that she was subjected to afterward, caused a compensable mental injury under the Worker's Compensation Law. But they dispute her resulting impairment and eligibility for increased permanent partial disability benefits. For the reasons below, the Court holds Ms. Matthews's impairment rating is ten percent and she is entitled to increased benefits.

### Claim History

*Lay testimony*

Ms. Matthews worked as the store manager for Family Dollar. On October 16, 2019, she was working with two other team members who were out on the floor while she was at the register. They were preparing to close around 9:45 p.m., when a man, dressed in red with his face covered and carrying a gun, entered the store and said, "You know

1

what this is." He heard her coworkers and realized she was not alone, so he cocked the weapon. She gave him the money, and he left.

Ms. Matthews immediately closed the store, contacted her manager, and called the police. After giving her statement, she went home. That same night, Ms. Matthews was "in shock." She began having frequent nightmares about the incident, including hearing a gun being cocked and sometimes firing.

After one day off, Ms. Matthews had to return to work. She did so for about a month. During that time, the gunman returned to the store several times to "taunt" her. Ms. Matthews recalled one instance when he drove up next to her behind the store while she was taking out the trash. He rolled down the window and said, "I should have shot you." Another time, she noticed his car following hers after she left work. She saw a police officer on patrol. For a few days, the police parked near her street to ensure her safety.

During that month, Ms. Matthews was "jumpy" at work. For example, she would yell at customers to "take your hands out of your pockets," and she was fearful of men in hoodies. Ultimately, Family Dollar placed her on "medical leave." Ms. Matthews saw a counselor of Family Dollar's choosing. The counselor restricted her from working and later recommended psychiatric treatment.

Family Dollar then directed her to treat with psychiatrist Dr. Greg Kyser, who offered medication and psychotherapy and kept her off work. Ms. Matthews saw him every two weeks initially, but the frequency lessened as she improved. Altogether she saw him thirteen times including the date of maximum medical improvement, April 20, 2021. She now sees him every three months. Dr. Kyser assigned a ten-percent impairment rating and restricted her from working retail or in positions that require interfacing with the public.

Family Dollar requested an employer's examination seeking another opinion on her impairment. Ms. Matthews saw Dr. Stephen Montgomery in June 2021, who concluded she suffered a 2.5 percent impairment.

The conflicting ratings prompted an evaluation through the Medical Impairment Rating Registry. The parties chose Dr. Melvin Goldin, who saw her in May 2022 and concluded she retained a ten-percent impairment rating.

At trial, both on direct examination and cross, the testimony described the robbery and its impact on Ms. Matthews's life, as well as other stressful events. Among them, Ms. Matthews was diagnosed with cancer in 2014, which treatment required radiation and extensive recovery time. In 2018, she learned that her brother had molested her teenage daughter. Ms. Matthews and her daughter survived a March 2020 tornado, which destroyed their home; they were inside it at the time and awoke to portions of the roof

completely blown off. Then in October 2020, Ms. Matthews's twenty-year-old son died unexpectedly after an asthma attack. She was also involved in a serious car accident that month, suffering a stroke and spending a week in the intensive care unit.

Ms. Matthews did not seek mental-health counseling for any of these events, other than attending two grief counseling sessions after her son's death.[1] She acknowledged that the doctors' records said she did, but she maintained they were mistaken. Dr. Kyser prescribed medications, but the only other time she took antidepressants was for four months, before and after the birth of her daughter many years ago. She could not recall taking them for two months immediately after the cancer diagnosis. Ms. Matthews also denied being in a "deep, dark place" during her cancer treatment from 2014 to 2019, as stated in a Facebook post. She explained the post was merely offering "encouraging words" to others who might need help for their mental health.

As to what made the robbery and its aftermath stand out, among so many other misfortunes, Ms. Matthews explained that nature caused the tornado, and nothing could have prevented it. As for her son's death, she learned after the fact that he had seen doctors several times beforehand. His passing left her "angry" and "hurt."

In contrast, the robber made an intentional decision to hurt her. She explained:

> That is something a human chose to do. He had control to say no. He had control to not do it. And then he thought, 'Hey, I got away with it. So I'm going to taunt her; I'm going to follow her home.' That's what a human— something that is preventable. And it is the outcome of a decision that that person—that criminal—made. Because he's a criminal. And I keep up with him. I keep up with his arrest record. He's been arrested twenty-one times for armed robbery since then. And that's what makes this different.

Ms. Matthews testified that the robbery has left her extremely fearful. She moved from North Nashville to Gallatin because the new home is gated for security. Ms. Matthews does not leave home for outings such as shopping except when accompanied by her father, with whom she lives, or another family member. She is fearful of large groups of people.

Ms. Matthews began a master's degree program, but she abandoned it after only a few months, despite describing learning as her "happy place." Her bachelor's degree is in public health, and she used to be involved in the community. But now she says she cannot work in that field.

---

[1] In 1998, Ms. Matthews was in a physically-abusive romantic relationship. She was sued by her former boyfriend's parents after they broke up, which lawsuit was later dismissed. Ms. Matthews testified that this did not cause her to seek treatment. The Court credits her testimony that this event, very remote in time, did not significantly affect her mental health and is not relevant to the current dispute.

3

As to her employment, post-injury, Ms. Matthews never returned to Family Dollar after being placed at maximum medical improvement. She had been earning an annual salary of $51,500, for work-weeks ranging from fifty to seventy hours, and she did not receive overtime pay.

Instead, Ms. Matthews returned to work in January 2022 for HCA. Her position in human resources allowed her to work entirely from home. On March 1, 2022, she was earning $22 per hour. Two paystubs confirmed that rate and showed she earned overtime, although Ms. Mathews said that overtime was no longer permitted after March 2022.

She lost that job, however, and found new employment, albeit seasonal, at The Gap. There, Ms. Matthews worked as a human resources coordinator for several months. When the job was ending, she was told they would advance her in that department if she could work as a liaison, facing the public. She estimated the pay increase would have been about $20,000 annually. But she declined due to her mental condition and was let go. Ms. Matthews very recently returned to The Gap, this time in the warehouse, where she picks orders and does not interact with the public.

Ms. Matthews acknowledged that she attempted self-employment as a business and human resources consultant in 2021, receiving a loan from the federal government of approximately $17,000. She testified that she had only two clients and used their payments of $3,000 total and the loan money to pay two employees. She never made any money from the venture. The loan was forgiven. In addition, Ms. Matthews started a nonprofit but never took any steps to achieve its purpose because she is unable to fundraise in her condition. The nonprofit is now inactive, and she earned no income from it.

The parties presented deposition testimony from the three experts. Their testimony is summarized below.

*Expert testimony*

Dr. Kyser is the authorized treating physician but was not selected from a panel. He testified that he is Board-certified in psychiatry, has been practicing for over thirty years, and has a "certification as an expert" in using the AMA Guides to assign impairments for mental injuries. He devotes about one-third of his practice to treating workers' compensation patients and has treated "an abundance" of injured workers for PTSD for about twenty years.

He recalled that Ms. Matthews first saw him in January 2020, at which time he diagnosed PTSD with some depressive components. As treatment progressed in spring 2020, after she lost her home, Dr. Kyser noted "other things going on" in her life, but he said she had "symptoms that [were] specific to the work event, specific to the perpetrator,

4

specific to the PTSD . . . related to the robbery attempt." As that year passed, she continued to "exhibit social avoidance" and was "hypervigilant." In April 2021, he placed her at maximum medical improvement and assigned the ten-percent rating.

Dr. Kyser used the AMA Guides, sixth edition, and explained that it contains three rating scales: 1) psychiatric impairment; 2) global assessment functioning; and 3) brief psychiatric rating. Each scale is interpreted using a scale and yields a percentage. Of the three percentages, the median score becomes the rating. Dr. Kyser said that with Ms. Matthews, the scales all resulted in ten percent, so that is her rating. He testified that he was aware of her cancer, the tornado, and the death of her son, and took those into account. Yet, he concluded, "to a reasonable degree of medical certainty . . . greater than 50 percent of the cause of her PTSD and resulting impairment is the armed robbery[.]"

On cross, Dr. Kyser acknowledged that the Guides suggest that a treating physician should avoid serving as an expert for his patients, but he denied that this wording or his relationship with Ms. Matthews created an "obvious conflict." Dr. Kyser noted a paucity of psychiatrists in the state willing to treat workers' compensation patients and said that by his understanding of the law, as a treating physician he is required to assign the impairment. He noted that it becomes a question of credibility for the judge to decide.

His examination revealed no malingering. Dr. Kyser categorized multiple traumatic events such as the tornado and loss of her son as "risk factors" for PTSD, but later clarified, "I'm not aware of any evidence that she was suffering from Post-Traumatic Stress Disorder at the time of her work injury." Dr. Kyser explained that he and Dr. Montgomery agreed on the diagnosis, but they disagreed on how it affected Ms. Matthews and Dr. Montgomery's apportionment.

Turning now to Dr. Montgomery, he is a forensic psychiatrist with twenty-eight years' experience. He is also board-certified. Dr. Montgomery treats patients at the hospital for "a full range of psychiatric conditions," including PTSD, about half his workdays and spends the other half performing forensic examinations.

Dr. Montgomery performed an employer's examination in June 2021 and took a detailed history, as shown in his lengthy report. He was aware that the robber cocked the gun, although his report does not reflect that. Dr. Montgomery, too, offered a lengthy explanation of his rating. He also administered testing, which he said was not mandated by the Guides. He performed the same three scales and initially found a five percent rating.

Dr. Montgomery considered her "pre-existing or subsequent psychiatric traumatic events" to assign his rating. He said, "While I think that the incident at work, the robbery, was traumatic and did cause her some degree of psychiatric impairment, I don't think it is logical for one to conclude that that is the sole cause of her psychiatric symptoms and impairments."

Therefore, he apportioned fifty percent to the work incident and fifty percent to "all these other factors in her life." This resulted in a rating of 2.5 percent. On cross, he said that apportionment is not determined using tables or charts but with "medical judgment."

Dr. Montgomery had not seen Dr. Goldin's report at the time of his deposition but apparently read portions of it during his deposition. His only critique of Dr. Goldin was about a misunderstanding of timelines.

Given the experts' disagreement, the parties requested a third evaluation from the Medical Impairment Rating Registry and chose Dr. Melvin Goldin. Dr. Goldin has been practicing for over forty years. He devotes his entire workday to treating patients and has treated workers' compensation patients for the past ten years.

Dr. Goldin evaluated Ms. Mathews using the same three scales from the Guides, and he found a ten-percent impairment. He believed he could provide a more objective opinion as an independent observer. He agreed it was "possible" that Ms. Matthews already had a psychiatric impairment before the robbery, but he did not conclude that with a reasonable degree of medical certainty. Dr. Goldin was asked on direct by Family Dollar's counsel, "[C]an you say to a reasonable degree of medical certainty that the ten percent permanent impairment rating you provided would be based solely on the work injury?" He said no.

On cross examination by Ms. Matthews's attorney, Dr. Goldin was later asked if, "to a reasonable degree of medical certainty that the impairment rating [he] submitted to the state in [his] MIR report . . . [was] correct." He said yes, "with the caveat that there are factors, which if I had access to more data, might have altered."

**Findings of Fact and Conclusions of Law**

At a compensation hearing, Ms. Matthews must show by a preponderance of the evidence that she is entitled to benefits. Tenn. Code Ann. § 50-6-239(c)(6) (2022).

*Impairment*

Under Tennessee Code Annotated section 50-6-204(d)(4), Dr. Goldin's impairment rating as the Registry physician is presumed to be accurate but may be rebutted by clear and convincing evidence. In *Mansell v. Bridgestone Firestone North American Tire*, 417 S.W.3d 393, 411 (Tenn. 2013), the Tennessee Supreme Court considered this statute and defined the clear and convincing standard as follows: "[I]f no evidence has been admitted which raises a serious and substantial doubt about the evaluation's correctness, the MIRR evaluation is the accurate impairment rating."

The Court in *Mansell* also gave factors to consider when deciding whether a party rebutted the Registry physician's statutory presumption of accuracy. Those factors include: (1) a comparison of the specialties of the physicians providing the ratings; (2) whether a disagreement exists between the physicians regarding the employee's diagnosis; and (3) whether a Registry physician "used an incorrect method or an inappropriate interpretation" of the AMA Guides. *Id*. at 410-411. Further, "the focus is on the evidence offered to rebut [the Registry] physician's rating." *Id*. at 411.

Considering those factors, all three physicians possess the same specialty and are well-qualified, and they all agree with the diagnosis of PTSD stemming from the robbery at work. Moreover, all three used the same methodology in the Guides—the three scales— to calculate their ratings.

They differ somewhat in their opinions regarding expert testimony on behalf of a patient and apportionment. First, the Guides suggest avoiding serving as an expert witness for legal purposes on behalf of a patients mainly because it could be detrimental to their therapeutic relationship. Here, Dr. Kyser and Ms. Matthews both knew he would be asked to testify. As Dr. Kyser pointed out, the Workers' Compensation Law requires a treating doctor to assign impairment. *See* Tenn. Code Ann. § 50-6-204(k)(1) (permanent impairment ratings shall be assigned by the treating physician).

In addition, only Dr. Montgomery apportioned his rating. He considered "pre-existing or subsequent psychiatric traumatic events." The Guides state that apportionment entails consideration of only "preexisting" conditions from the "total" or "all-inclusive" rating. Therefore, Dr. Montgomery improperly considered events such as the tornado, Ms. Matthews's son's death, and the car accident in assessing the apportionment, making his opinion less reliable. Also, he never specifically assigned an impairment rating to the alleged preexisting traumatic events.

Finally, Dr. Montgomery did not suggest that Dr. Goldin used an incorrect method or an inappropriate interpretation of the AMA Guides. In sum, neither Dr. Montgomery's opinions nor Dr. Goldin's cross-examination of the content of his report raise "serious and substantial doubt" about the accuracy of Dr. Goldin's rating.

But even if he had, Dr. Goldin's opinion is supported by Dr. Kyser's, who treated Ms. Matthews on thirteen occasions before giving his rating. "It seems reasonable that the physicians having greater contact with the Plaintiff would have the advantage and opportunity to provide a more in-depth opinion, if not a more accurate one." *Orman v. Williams Sonoma, Inc.,* 803 S.W.2d 672, 677 (Tenn. 1991). Dr. Kyser recounted this treatment in detail, as well as how he calculated his rating. He testified that he was aware of her cancer, the tornado, and the death of her son, and took those into account. Dr Kyser never wavered in his opinion on the causes of her PTSD or the rating despite rigorous cross-examination.

Moreover, his opinion on the impairment rating is presumed correct. Tenn. Code Ann. § 50-6-204(k)(7).

This leaves two medical opinions that carry presumptions of correctness in their own right and are opposed by an employer's examination that reaches a different impairment rating using the same methodology and information. Dr. Montgomery's opinion neither overcomes that of Dr. Kyser by a preponderance of the evidence, nor does it provide clear and convincing evidence to overcome Dr. Goldin's MIRR opinion.

Turning to the lay testimony, the employee's own assessment of her physical condition and resulting disability is competent testimony not to be disregarded. *Orrick v. Bestway Trucking, Inc.*, 184 S.W.3d 211, 217 (Tenn. 2006). Ms. Matthews credibly and convincingly testified that the robbery caused her PTSD, that she remains fearful of large groups of people, and she requires a family member's company for tasks such as shopping. She further testified that the robbery and harassment afterward was different because it involved another human making an intentional choice to hurt her, as opposed to a natural disaster or succumbing to a potentially deadly illness. Her point made a strong impression; the Court finds Ms. Matthews wholly credible.

Therefore, considering the expert and lay testimony, the Court finds that Ms. Matthews sustained a ten-percent permanent partial impairment as determined by Dr. Goldin. The Court further holds that Family Dollar did not rebut the presumption of correctness attached to Dr. Goldin's rating by clear and convincing evidence.[2] Thus, the Court awards Ms. Matthews ten-percent permanent partial disability benefits under Tennessee Code Annotated section 50-6-207(3)(A). Her original award is calculated as ten percent times 450 weeks times the stipulated compensation rate of $528.82, or $23,796.90.

*Increased benefits*

For increased benefits, Tennessee Code Annotated section 50-6-207(3)(B) states that an employee may make a claim for increased benefits if at the time the initial compensation period ends, the employee has returned to work and is receiving "wages or a salary that is less than one hundred percent (100%) of the wages or salary the employee received from his pre-injury employer on the date of injury." Further, "if appropriate," the injured employee's award shall be increased by multiplying the award by 1.35. *Id.*

The Appeals Board examined the history of this provision in *Marshall v. Mueller Company,* 2016 TN Wrk. Comp. App. Bd. LEXIS 74 (July 11, 2016). The Board pointed out that the Reform Act did not define "wages" as used in section 50-6-207(3)(B), nor did

---

[2] Even if the Court could conclude that the presumption was rebutted, the result would be the same, as Dr. Kyser's opinion outweighs Dr. Montgomery's for other reasons mentioned above.

earlier provisions of the Tennessee Workers' Compensation Act define "wages." *Id.* at *12. Further, the term "wage" means "the hourly rate of pay for an employee who is compensated on an hourly basis." *Id.* Although overtime wages may increase the average weekly wage received, overtime wages do not increase the hourly rate of pay. *Id.* at *24.

In addition, by including the phrase "[i]f appropriate" in authorizing a trial court to award increased benefits in section 50-6-207(3)(B), the legislature expressed its intent that a trial court consider all relevant factors, including the circumstances of an injured worker's ability and/or willingness to return to work in her disabled state and the reasonableness of the employer in attempting to return the injured employee to work. *Wright v. Tenn. CVS Pharmacy, LLC,* 2019 TN Wrk. Comp. App. Bd. LEXIS 72, at *12 (Oct. 31, 2019).

Here, Ms. Matthews earned a salary of $51,500 on the date of injury. This computes to an hourly rate of pay of $25.76.[3] At HCA, she earned $22.00 per hour. The fact that at both positions she worked overtime are not relevant. Also not germane are the facts that she attempted self-employment and to create a nonprofit, neither of which generated any income for her.

Rather, the Court finds that Ms. Matthews was working in a position that accommodated her inability to interface with the public, in line with Dr. Kyser's permanent restrictions, at a lower rate of pay than what she was earning on the date of injury. Moreover, Ms. Matthews credibly explained that her positions since HCA accommodate her restrictions, and she was unable to accept a job that would have paid substantially more if she were able to work with the public. The Court finds her actions entirely reasonable, and Family Dollar never attempted to return her to work within her restrictions.

Under these circumstances, she has shown by a preponderance of the evidence that it is appropriate for the award to be increased by multiplying the original award by 1.35. Since she is over forty, that award shall be multiplied by 1.2. Her resulting award is $38,550.98.

**IT IS, THEREFORE, ORDERED** as follows:

1. Family Dollar shall furnish medical care for Ms. Matthews's injury with Dr. Kyser as required by Tennessee Code Annotated section 50-6-204.

2. Family Dollar shall pay Ms. Matthews permanent partial disability benefits and increased benefits, for a resulting award of $38,550.98.

3. Ms. Matthews's attorneys are entitled to a twenty-percent fee to be paid from her award. Tenn. Code Ann. § 50-6-226(a)(1).

---

[3] Computed by dividing $51,500 by fifty-two weeks and again by a forty-hour work week.

4. Ms. Matthews is entitled to reimbursement of reasonable costs Tennessee Code Annotated section 50-6-239(c)(8) and Tennessee Rule of Civil Procedure 54.04. Her attorney may file a petition requesting them.

5. This case is referred to the Compliance Program for consideration of the imposition of a penalty for Family Dollar's failure to offer Ms. Matthews panels of physicians.

6. Family Dollar shall pay the $150.00 filing fee to the Clerk within five business days under Tennessee Compilation Rules and Regulations 0800-02-21-.06 (February, 2022).

7. Family Dollar shall file form SD-2 with the Clerk within ten business days of this order becoming final.

8. Unless appealed, this order shall become final in thirty days.

**ENTERED April 24, 2023**


*Kenneth M. Switzer*
**JUDGE KENNETH M. SWITZER**
Court of Workers' Compensation Claims

APPENDIX

Exhibits:
1. Deposition transcript of Dr. Goldin
2. Deposition transcript of Dr. Montgomery
3. Deposition Transcript of Dr. Kyser
4. Medical records
5. Wage stubs

Technical Record:
1. Petition for Benefit Determination
2. Dispute Certification Notice and Employer's additional issues, November 15, 2021
3. Order on Status Hearing, February 1, 2022
4. Order on Status Hearing, June 13, 2022
5. Order on Status Hearing, July 18, 2022
6. Order on Status Hearing, September 20, 2022
7. Employer's Expert Disclosure
8. Order Setting Compensation Hearing

9. Joint Pre-Compensation Hearing Statement
10. Employee's Compensation Hearing Brief
11. Employee's Witness and Exhibit List
12. Employer's Pre-Hearing Brief
13. Employer's Witness and Exhibit List
14. Dispute Certification Notice and Employer's additional issues, March 29, 2023

## CERTIFICATE OF SERVICE

I certify that a copy of this Order was sent as indicated on April 24, 2023.

| Name | Certified Mail | Fax | Email | Service sent to: |
|---|---|---|---|---|
| Jonathan May, Rhoberta Orsland, Employee's attorneys | | | X | jmay@forthepeople.com lwaite@forthepeople.com rorsland@forthepeople.com |
| Tiffany Sherrill, Employer's attorney | | | X | tbsherrill@mijs.com jrcordle@mijs.com agcroft@mijs.com |
| Compliance Program | | | X | WCCompliance.Program@tn.gov |

_____

**Penny Shrum, Clerk of Court**
**WC.CourtClerk@tn.gov**

11



# NOTICE OF APPEAL

Tennessee Bureau of Workers' Compensation
www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

**Docket No.:** _____

**State File No.:** _____

**Date of Injury: _____**

_____

**Employee**

v.

_____

**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies).  Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____          ☐ Motion Order filed on _____

☐ Compensation Order filed on_____          ☐ Other Order filed on_____

issued by Judge _____.

## Statement of the Issues on Appeal

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____
_____
_____
_____

## Parties

**Appellant(s)** (Requesting Party): _____ ☐Employer ☐Employee

Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐Employer ☐Employee

Appellee's Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

### CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 _____.

_____
*[Signature of appellant or attorney for appellant]*